

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 JUN 21   PM 2: 10

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **BETHANY ROY,** | **CIVIL ACTION NO. 04-3011** |
| **Plaintiff,** | **SECTION C** |
| **VERSUS** | **JUDGE HELEN G. BERRIGAN** |
| **BAYOULAND YMCA and ALEX SMITH,** | **MAGISTRATE NO. 4** |
| **Defendants.** | **MAGISTRATE KAREN WELLS ROBY** |

### <u>MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT</u>

Now come Defendants Bayouland YMCA and Alex Smith who move the court for the following relief:

Mr. Smith moves the court for dismissal due to Plaintiff's failure to serve the Complaint on him.

Bayouland YMCA moves the court for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the grounds there are no material facts in dispute and it is entitled to judgment as a matter of law dismissing all Plaintiff's claims with prejudice.

Mr. Smith alternatively moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the grounds there are no material facts in dispute and he is entitled to judgment as a matter of law dismissing all Plaintiff's claims with prejudice.

Wherefore, Defendants pray their motions be granted and all Plaintiff's claims be dismissed with prejudice at her sole cost and expense.

___ Fee_____
___ Process_____
_X_ Dktd_____
_/_ CtRmDep_____
___ Doc. No._____

Respectfully submitted,

**EDWARD F. HAROLD**
 La. Bar Roll No. 21672
**KEVIN TROUTMAN**
   Louisiana Bar Roll No. 27668
Fisher & Phillips LLP
201 St. Charles Avenue
Suite 3710
New Orleans, Louisiana  70170-3710
Telephone:  (504) 522-3303
Facsimile:  (504) 529-3850

**COUNSEL FOR DEFENDANTS,
BAYOULAND YMCA AND ALEX
SMITH**

## CERTIFICATE OF SERVICE

I hereby certify that I have served the above and foregoing Motion to Dismiss and

Motion for Summary Judgment via hand delivery properly addressed and postage prepaid on:

Bethany Roy
5425 Bayou Black Drive
Gibson, LA 70356

this **21** day of June 2005.

EDWARD F. HAROLD

2

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **BETHANY ROY,** | **CIVIL ACTION NO. 04-3011** |
| **Plaintiff,** | **SECTION C** |
| **VERSUS** | **JUDGE HELEN G. BERRIGAN** |
| **BAYOULAND YMCA and** | **MAGISTRATE NO. 4** |
| **ALEX SMITH,** | **MAGISTRATE KAREN WELLS ROBY** |
| **Defendants.** | |

### DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL
### FACTS SUPPORTING MOTION FOR SUMMARY JUDGMENT

1. In July, 2002, when a Program Director job became available, Mr. Smith promoted Ms. Roy to the position. Smith Declaration ¶ 1; Plaintiff's Deposition pp. 56 – 57.

2. In this Program Director position, Roy was responsible for sports activities such as soccer and flag football; sports officials; Gym Rompers; and several child care services, including after school care and holiday and summer camps. Smith Declaration ¶ 2.

3. Mr. Smith recognized that Roy faced a learning curve in her new position, so he coached her constructively. Smith Declaration ¶ 3.

4. When he evaluated her after almost one year in the role of Program Director, he remained supportive and granted her a pay increase, but he also identified several aspects of Roy's performance that needed improvement. Smith Declaration ¶ 3.

5. These areas included: a) adopting the philosophy that "the customer is always right;" b) paying attention to detail in dealing with team coaches; c) developing written policies for

coaches; d) establishing policies to ensure that children left in the YMCA's care would not be left unattended; and e) demonstrating patience in dealing with others.  Plaintiff's Deposition Exhibit 1.

6.    Ms. Roy failed to follow through on Smith's directive to implement a policy to ensure that children under her department's care would not be left unattended. Smith Declaration ¶ 4.

7.    As a result, children were sometimes not adequately supervised. Smith Declaration ¶ 4.

8.    During Roy's tenure, Sunshine Express Early Care and Education Center, that cares for children who are mentally and/or developmentally challenged, terminated its relationship with Bayouland.  Smith Declaration ¶ 5, Exhibit B to Smith Declaration.

9.    As a direct result of Roy's conduct, 15-20 children withdrew from participation in a special program at Bayouland. *Id.*

10.   Participants in other programs lodged numerous complaints directly related to Roy's job performance. Smith Declaration ¶ 6; Plaintiff's Deposition pp. 50-51.

11.   Bayouland received recurring complaints about her handling of its soccer program, including a pattern of unacceptable interaction with participants' parents.  Smith Declaration ¶ 6; Roy Deposition p. 84. .

12.   Parents described her as argumentative, inflexible and difficult to deal with. Smith Declaration ¶ 6.

13.   As a result of these complaints, Smith and Murdock Gilmore, another senior manager at the YMCA, scheduled a meeting with soccer parents to discuss their concerns on October 8, 2003.  Smith Declaration ¶ 7.

2

14. Despite telling Mr. Gilmore on October 8 that she would attend the meeting, Roy did not attend the meeting. *Id.*

15. Parents attending the meeting were further upset by this demonstration of Roy's apparent lack of interest in their concerns, but they characterized it as typical of her behavior toward them. *Id.*

16. Smith and Gilmore prepared a survey for parents to help Bayouland improve the soccer program.  Smith Declaration ¶ 8.

17. Parents' responses to the survey demonstrated a high level of frustration and dissatisfaction with Ms. Roy's job performance. Smith Declaration ¶ 9.

18. Through the survey, fully half of the parents responding described their perception of the program as "poor" and none of them rated it as "excellent."  *Id.*

19. Only one of twelve parents who responded to the survey thought that their child would rate the program as excellent.  *Id.*

20. Parents' comments described the program as disorganized and the director (Ms. Roy) as an extremely poor communicator who was not available to help resolve problems. *Id.*

21. Although she was responsible for Children's Holiday Camp during Thanksgiving week, 2003, Roy left work early on Monday, November 24, without communicating with Smith.  Smith Declaration ¶ 13; Plaintiff's deposition p. 78.

22. She remained absent on Tuesday. Plaintiff's Deposition p. 78.

23. Due to her absence, there was inadequate staff to care for the children. Plaintiff's deposition p. 79.

3

24. Smith and his staff took steps to ensure that the children were properly supervised and to clear up significant confusion among parents regarding arrangements for their children's snacks. Smith Declaration ¶ 15.

25. They also straightened out the activity schedule that Roy had prepared for the week, which was in disarray. *Id.*

26. When Roy returned to work on Wednesday, November 26, she expressed displeasure with her colleagues who had stepped in to help during her absence and accused them of meddling with the operation of her department. Smith Declaration ¶ 16; Plaintiff's Deposition pp. 77 – 78.

27. She directed the same behavior toward Smith. Smith Declaration ¶ 17.

28. Roy denied responsibility for the situation and denied that she had left the children in unsafe circumstances. Smith Declaration ¶ 17.

29. Ms. Smith viewed her behavior toward him as insubordinate and completely unacceptable. Smith Declaration ¶ 18.

30. Smith considered this situation and Roy's response to it, together with her mounting record of poor performance and client dissatisfaction. *Id.*

31. He terminated her. *Id.*

32. Plaintiff identified four incidents that she contends constitute hostile environment sexual harassment:

    a. she overheard Mr. Smith say to another unidentified gentleman that he liked short skirts

    b. during a discussion of a member's wearing of inappropriate workout attire, Mr. Smith allegedly said "big butts are in style

4

    c.  on one occasion, Mr. Smith and Plaintiff were returning to the Y together from a business trip, Mr. Smith stopped at his home to retrieve some papers he had forgotten there while Plaintiff sat in the car outside waiting for him to return

    d.  another female employee showed her an email the employee claimed to have received from Mr. Smith containing an advertisement for a female version of Viagra. Plaintiff's Deposition pp. 15 – 18; 66 – 67.

33. Plaintiff heard other employees claim they had observed pornographic pictures on a computer used by Mr. Smith. Plaintiff's Deposition p. 14.

34. Plaintiff admits she never personally saw any of these alleged pictures. *Id.*

35. The Board of the Y conducted an investigation into these allegations and could find no evidence of any pornography on the computer. Declaration of Rene Willliams.

36. Bayouland YMCA has an anti harassment policy. Plaintiff's Deposition p. 108.

37. Plaintiff received a copy of and was familiar with the anti harassment policy. Plaintiff's Deposition pp. 107 – 108.

38. The policy contained a reporting procedure telling employees that they may take their complaints to a higher level if they are not satisfied with the response of the lower level. Plaintiff's Deposition pp. 107 – 108.

39. Plaintiff had a meeting with the Chairman of the Board of Bayouland YMCA, Rene Williams. Plaintiff's Deposition pp. 108 – 109.

40. During this meeting she neither stated she was being sexually harassed nor apprised Mr. Williams of the alleged comments made by Smith. *Id.*

41.   Plaintiff sought no medical treatment as a result of the conditions she alleges constitute intentional infliction of emotional distress. Plaintiff's deposition p. 110.

42.   Plaintiff relies on two alleged events as the basis for her intentional infliction claim: 1) Mr. Smith criticized her performance in manager meetings and did not giver her positive direction and 2) Mr. Smith asked her to change participation numbers in a program for purposes of securing additional funding. Plaintiff's deposition pp. 71 – 74.

Respectfully submitted,

**EDWARD F. HAROLD**
  La. Bar Roll No. 21672
**KEVIN TROUTMAN**
     Louisiana Bar Roll No. 27668
Fisher & Phillips LLP
201 St. Charles Avenue
Suite 3710
New Orleans, Louisiana  70170-3710
Telephone:  (504) 522-3303
Facsimile:  (504) 529-3850

**COUNSEL FOR DEFENDANTS,
BAYOULAND YMCA AND ALEX
SMITH**

## CERTIFICATE OF SERVICE

I hereby certify that I have served the above and foregoing via hand delivery on:

Bethany Roy
5425 Bayou Black Drive
Gibson, LA 70356

this **21** day of June 2005.

EDWARD F. HAROLD

7

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| BETHANY ROY, | CIVIL ACTION NO. 04-3011 |
| Plaintiff, | SECTION C |
| VERSUS | JUDGE HELEN G. BERRIGAN |
| BAYOULAND YMCA and ALEX SMITH, | MAGISTRATE NO. 4 |
| Defendants. | MAGISTRATE KAREN WELLS ROBY |

FILED_____     _____
                                         DEPUTY CLERK

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

I.     **INTRODUCTION**

Defendant Bayouland YMCA ["Bayouland"] is a membership-based recreational, health, fitness and wellness center that focuses largely upon the participation of families. The vast majority of its employees are part-time workers, so it depends heavily on the friendliness and reliability of the few employees who work full-time.[1] These individuals not only coordinate Bayouland's many programs and activities, but they primarily represent Bayouland to its many clients and set a service-oriented tone for the rest of the workforce.

---

[1] As of January, 2004, Bayouland had seven full-time and 45 part-time employees.

Plaintiff began her employment with Bayouland as an attendant in its Kid's Zone Program. In June of 2002, Alex Smith, Bayouland's director, promoted her to Program Director. In October of 2003, Plaintiff had failed to live up to expectations and was the subject of numerous customer complaints. Following a particularly egregious failure on the part of Plaintiff to properly staff a holiday camp, a situation that could have put children at risk, Mr. Smith taking into account her overall record of poor performance, terminated her.

Plaintiff claims Mr. Smith, the same person who promoted her into a manager position, discriminated against her on account of her gender when he terminated her. She also attempts to make out a sexual harassment claim and an intentional infliction of emotional distress claim. Plaintiffs' deposition testimony establishes that these claims have no merit. Rather, they are the typical attempt by an angry ex-employee to make a mountain out of a mole hill. Each of her claims will be addressed in turn.

## II.   SEXUAL HARASSMENT

### A.   STATEMENT OF UNDISPUTED FACTS[2]

In her deposition, Plaintiff identified four incidents that she contends constitute her claim of sexual harassment. These are: 1) she overheard Mr. Smith say to another unidentified gentleman that he liked short skirts; 2) during a discussion of a member's wearing of inappropriate workout attire, Mr. Smith allegedly said "big butts are in style;" 3)  on one occasion, Mr. Smith and Plaintiff were returning to the Y together from a business trip, Mr. Smith stopped at his home to retrieve some papers he had forgotten there while Plaintiff sat in the car outside waiting for him to return, and 4) another female employee showed her an email

---

[2] Citations to the Exhibits submitted herewith supporting this motion are contained in the separate Statement of Undisputed Material Facts filed herewith.

the employee claimed to have received from Mr. Smith containing an advertisement for a female version of Viagra.

Plaintiff heard other employees claim they had observed pornographic pictures on a computer used by Mr. Smith. Plaintiff admits she never personally saw any of these alleged pictures. The Board of the Y conducted an investigation into these allegations and could find no evidence of any pornography on the computer nor any history of any pornography on the computer.

### B.    LEGAL STANDARDS FOR ESTABLISHING SEXUAL HARASSMENT

To state an actionable harassment claim, Plaintiff must show that the alleged harassment was based on gender. Title VII does not make harassment illegal unless that harassment is because of the Plaintiff's protected characteristic. *See e.g., Oncale v. Sundowner Offshore Services, Inc.*, 118 S.Ct. 998, 1001 523 U.S. 75, 140 L.Ed.2d 201,  (1998). If Plaintiff can show harassment based on gender, then the Court must analyze an employer's responsibility for that conduct under the "road map" the Fifth Circuit created in light of the Supreme Court's pronouncements in *Burlington Industries ; Inc. v. Ellerth*, 524 U.S. 741 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).  The first step requires determining whether the plaintiff has suffered a "tangible employment action."  *Casiano v. AT&T Corp.*, 213 F.3d 278 (5th Cir. 2000).

If the Plaintiff did not suffer a tangible employment action, the court must determine if the harassment alleged by plaintiff was sufficiently severe or pervasive so as to create a hostile environment. *Id.* "[J]udicial inquiry into the question whether a given instance of harassment constitutes sex-based discrimination is entirely separate from inquiry into whether the harasser's conduct was serious enough to constitute either *quid pro quo* or hostile environment harassment. *La Day v. Catalyst Technology, Inc.*, 302 F.3d 474, 478 (5th Cir.  2002). If not, then the employer

3

is not liable. *Id.* If so, then the employer is vicariously liable unless it can demonstrate the affirmative defense provided in *Faragher* and *Ellerth*, that is, (1) "it exercised reasonable care to prevent or correct promptly any such … harassment, and (2) the employee did not unreasonably fail to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at *15 (*citing Ellerth*, 524 U.S. at 765 and *Faragher*, 524 U.S. at 805, 807).[3]

## C.   PLAINTIFF DOES NOT ALLEGE THE HARASSMENT RESULTED IN HER TERMINATION

While the Complaint contains an allegation of "quid pro quo" harassment, Plaintiff admitted she was never asked for sexual favors or propositioned. The term "quid pro quo" was simply pulled from some research Plaintiff claims she did at a library.[4] Plaintiff also did not connect the alleged harassment in any way to her termination.[5] As such, Plaintiff has not alleged any tangible employment action resulting from the alleged harassment making this a hostile environment case. *See, e.g., Butler v. Ysleta Ind. Sch. Dist.*, 161 F.3d 263, 268 (5th Cir. 1998) (Plaintiff's offered no evidence connecting their unfavorable grade reassignments to harassing letters from their supervisor); *Robinson v. Truman College*, 1999 WL 33887, *3-4 (N.D. Ill. 1999); EEOC Guidance: Vicarious Employer Responsibility for Unlawful Harassment, Section IV(C).

---

[3] Because Louisiana courts routinely look to Title VII for guidance in interpreting La. R. S. 23:301 *et seq.*, the analysis for Plaintiff's state law claims of co-employee sex harassment and any state law retaliation claim is subsumed in the discussion of Title VII. *Boudreaux v. Louisiana Casino Cruises, Inc.*, 762 So.2d 1200, 1204 (La. App. 1st Cir. 2000).

[4] Plaintiff's Deposition pp. 69 - 71.

[5] Plaintiff's deposition pp. 74 – 77.

4

### D.   THE CONDITIONS NECESSARY TO CREATE AN ACTIONABLE HOSTILE ENVIRONMENT

The Supreme Court has made clear the standards for finding conduct is sufficiently hostile to actually affect a term or condition of employment is a high bar.

> The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview." *Harris,* 510 U.S., at 21, 114 S.Ct., at 370, citing *Meritor,* 477 U.S., at 67, 106 S.Ct., at 2405-2406. We have always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace--such as male-on-male horseplay or intersexual flirtation--for discriminatory "conditions of employment."

*Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81 -81, 118 S.Ct. 998, 1003 (U.S.1998). *See also Harris v. Forklift Systems, Inc.,* 114 S. Ct. 267 (1993); *Bustamento v. Tucker,* 607 So.2d 532 (La. 1992); *Pfeil v. Intecom Telecommunications,* 90 F.Supp.2d 742 (N.D. Tex. 2000). To establish the existence of a hostile environment, plaintiff must show "(1) sexually discriminatory intimidation, ridicule, and insults that are; (2) sufficiently severe or pervasive that they; (3) alter the conditions of employment; and (4) create an abusive working environment." *Walker v. Thompson,* 214 F.3d 615, 625 (5th Cir. 2000); *Shepherd v. Comptroller of Public Accountants of Texas,* 168 F.3d 871, 873 (5th Cir. 1999). "[I]ncidents of rude behavior, without more, are insufficient to create an actionable hostile work environment." *Hicks v. Central Louisiana Elec. Co., Inc.,* 97-1232 (La. App. 1 Cir. 1998). Further, in order to establish a hostile environment, "A plaintiff … must show that implicit or explicit in the sexual content is the message that the plaintiff is incompetent because of her sex." *Butler v. Ysleta Independent School District,* 161 F.3d 263 (5th Cir. 1998).

5

> In determining whether an environment is hostile, several factors are relevant in the inquiry: (1) frequency of the discriminatory conduct; (2) the severity; (3) whether the conduct is physically threatening, or a mere offensive utterance; (4) whether the conduct unreasonably interferes with an employee's work performance; and (5) the conduct's effect on the employee's psychological well being. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

*Craven v. Universal Life Ins. Co.*, 95-1168  (La. App. 3 Cir. 1996), 670 So.2d 1358.

### E.   THE CONDUCT OF WHICH PLAINTIFF COMPLAINS FALLS WOEFULLY SHORT OF THE LINE DEMARCATING WHEN CONDUCT BECOMES SUFFICIENTLY SEVERE AND PERVASIVE TO VIOLATE TITLE VII

In determining if an actionable hostile environment exists, there is a grey area. One judge described the exercise of determining the existence of an actionable hostile environment as akin to "trying to nail a jelly fish to the wall." But there are a plethora of cases where the alleged conduct is so short of the level of severity required to constitute a "change in the working conditions" that they are ripe for summary judgment on the issue. *See e.g., Ngyuen v. Buchart Horn Inc.*, 2003 WL 21674461 (E.D. La.). This is just such a case.

Plaintiff complains about a total of four incidents. Her own testimony establishes that the conduct she complains about is at worst rude, and in one case, wholly benign. For example, Ms. Roy complains about Mr. Smith stopping at his home on the way back from a business event they attended and leaving her in the car while he went inside briefly to retrieve some papers.

> A.   I had been brought to the personal residence after, um, dropping off some Christmas gifts, I went back to the office and talked with her about how uncomfortable I was with that.  And she acted like it was, you know, no big deal.  He does it to a lot of females and not to worry about it.
>
> Q.   Okay.  Now, you -- did you ever go inside the CEO's personal residence?
>
> A.   No.

6

Q.   You were in fact on a business trip, correct?

A.   Yes.

Q.   And the two of you were in the same car?

A.   Yes.

Q.   And on the way back he stopped at the residence to pick up something?

A.   Yes.  Oh, I don't know what he stopped for.

Q.   Okay.  But anyway, you stayed outside in the car while he went inside, right?

A.   Yes.

Q.   How long was he inside?

A.   I don't recall.

Q.   Okay.  But he came back outside, got in the car, and then y'all continued back to the Y, correct?

A.   Yes.

Q.   And you're claiming that's sexual harassment?

A.   I'm claiming it made me uncomfortable.

Plaintiff's Deposition pp. 15 – 16.

Plaintiff's description of the comments she claims offended her reveal they were not vulgar, abusive, intimidating or hostile.[6] While perhaps inappropriate, they are hardly the makings of a federal case.

Q.   Do you remember any specific comments that Ms. Breaux alleged Mr. Smith made about women's body parts?

A.   Yes.  We were on a luncheon for rotary club, and we were walking out of the building.  And there were two gentlemen behind us.  I do not recall their names.  And, um, Mr. Smith made the comment about how much he liked short skirts, and just so

---

[6] While Mr. Smith denies making the comments, Defendants are accepting Plaintiff's testimony these comments were made for the purposes of this motion only.

NewOrleans 253955.1

happened Donna and I both had on short skirts that day, and that made me uncomfortable. Um, another time Ms. Breaux and I were in his office and we were commenting on the women in the -- there was a problem with a woman wearing inappropriate attire at the YMCA, and we were discussing it with Mr. Smith how to handle it because it was making some of our other guests uncomfortable. So um, the topic came up, and Mr. Smith said not to worry because big butts were back in style.

**\*\*\*\***

A.    Yes.  Also, I believe she wore Lycro (sic) pants that were tight.  It could have been shorts.  Now that I'm thinking about it, it could have been shorts.

Q.   Now, was this woman heavyset?

A.   She was shapely.  She had curves.

Q.    Were there also complaints about her bottoms or was it just the tops?

A.   I believe in general her attire was offensive to other members.

Q.    And it was in the course of discussing this issue about the lady's attire that Mr. Smith made this "big butts" comment?

A.   Yes.

Plaintiff's Deposition pp. 57 – 58.

Finally, Plaintiff complains about an email that was not sent to her, but was shown to her

by another female employee.

A.    I was in Ms. Breaux's office completing budget reports, actually she was assisting me, and she received an E-mail.  And she opened it in front of me, and it said "From Mr. Smith" in the "From" box, and it was in reference to a Viagra type pill for women.

Plaintiff's deposition p. 66.

Not only was this not sent to Plaintiff, the reference to "from Mr. Smith" hardly proves

Alex Smith sent the email to Ms. Breaux. In fact, Alex Smith's emails denote "From Alex

Smith," not Mr. Smith. It is much more likely that this was a random piece of spam.

8

The Fifth Circuit has rejected significantly more serious conduct as constituting a hostile environment. For example, in *Sheperd v. Comptroller of Public Accounts,* 168 F.3d 871 (5th Cir. 1999) the court viewed the following conduct as insufficient to establish a hostile environment as a matter of law.

> According to Shepherd's deposition, on one occasion Moore stood in front of Shepherd's desk and remarked "your elbows are the same color as your nipples." Shepherd testified that Moore remarked once "you have big thighs" while he simulated looking under her dress. Shepherd claimed Moore stood over her desk on several occasions and attempted to look down her clothing. According to Shepherd, Moore touched her arm on several occasions, rubbing one of his hands from her shoulder down to her wrist while standing beside her. Shepherd alleged additionally that on two occasions, when Shepherd looked for a seat after coming in late to an office meeting, Moore patted his lap and remarked "here's your seat."

The court went on to explain "each comment made by Moore [was] the equivalent of a mere utterance of an epithet that engender offensive feelings."

Here, at best, Plaintiff has identified two boorish comments. Her complaint that Mr. Smith stopped at his house on the way back from a business trip has nothing to do with gender or sex. While perhaps some might find it rude to wait in the car, no reasonable person would consider the event to be harassing, hostile or abusive. The email she complains about was not sent to her and her own testimony suggests it was not sent by Alex Smith at all. Taken as a whole, there is no way these incidents could have undermined Plaintiff's workplace competence or destroyed her opportunity to succeed in the workplace.

**F.   PLAINTIFF FAILED TO AVAIL HERSELF OF REASONABLE OPPORTUNITIES TO PREVENT SEXUALLY HARASSING BEHAVIOR**

Even if the conduct at issue created an actionable hostile environment, Plaintiff's own testimony establishes the *Faragher/Ellerth* defense bars her claim.

9

Q.    Were you aware of the Y's sexual harassment policies while you were there?

A.    Yes.

Q.    And those were available to you in the handbook and that sort of thing?

A.    Yes, sir.  When you begin employment, you're given that policies and procedure manual, and it is in there.

Q.    Okay.  And do you feel you understood the procedures for making complaints about discrimination or harassment?

A.    I do.

Q.    What's your understanding of those procedures?

A.    That basically the YMCA of the USA does not tolerate sexual harassment.

Q.    What about the reporting procedures?

A.    Um, I believe in the Bayouland YMCA they direct you to report to your immediate supervisor and then follow the command -- chain of command after that.

Q.    But you, um, were not -- I mean you were comfortable actually going to the chairman of the board of the YMCA to talk to them about your concerns, correct?

A.    I wasn't comfortable, but I deemed it necessary.  It certainly was uncomfortable to speak about certain things in general.  I mean, sexual harassment is not comfortable to speak to about anybody (sic).

Q.    But you -- I think we covered this earlier -- do you have any specific recollection of telling Mr. Williams I think Mr. Smith is sexually harassing me?

A.    No, I don't think I said those exact words.

Q.    Do you remember telling him, I didn't appreciate the "short skirt" comment?

A.    No, I did not say that.

Q.    Okay.  Do you remember saying anything to him about the "big butt" comment?

10

> A.    I don't remember.  I do remember saying I was -- believed I
> was being treated differently and uncomfortable with that.

In other words, Plaintiff testified that she was provided with a copy of the Bayouland

policies and procedures manual, that she was aware of Bayouland's sexual harassment policy,

that she understood the policy, that she knew sexual harassment was prohibited, that she had a

meeting with the chairman of the board of Bayouland to complain about her treatment and that

she never brought up her allegation of sexual harassment or mentioned the offensive comments

at that meeting. This is the quintessential case where (a) the employer exercised reasonable care

to prevent and correct promptly any sexually harassing behavior, *i.e.*, promulgating and

providing employees with a "no harassment policy," and (b) the plaintiff employee unreasonably

failed to take advantage of any preventive or corrective opportunities provided by the employer

or to avoid harm otherwise, *i.e.*, having a meeting with the Chairman of the Board and not even

mentioning the conduct."

Plaintiff's harassment claim must be dismissed.

## III.    **GENDER DISCRIMINATION**

### A.    **STATEMENT OF UNDISPUTED FACTS**

In July, 2002, when a Program Director job became available, Mr. Smith promoted Ms.

Roy to the position. Ms. Roy replaced Michael Woo, a male employee. In this Program Director

position, Roy was responsible for sports activities such as soccer and flag football; sports

officials; Gym Rompers; and several child care services, including after school care and holiday

and summer camps.

Mr. Smith recognized that Roy faced a learning curve in her new position, so he coached

her constructively.  When he evaluated her after almost one year in the role of Program Director,

he remained supportive and granted her a pay increase, but he also identified several aspects of

11

Roy's performance that needed improvement.  These areas included:  a) adopting the philosophy that "the customer is always right;" b) paying attention to detail in dealing with team coaches; c) developing written policies for coaches; d) establishing policies to ensure that children left in the YMCA's care would not be left unattended; and e) demonstrating patience in dealing with others.

Ms. Roy failed to follow through on Smith's directive to implement a policy to ensure that children under her department's care would not be left unattended. As a result, children were sometimes not adequately supervised.

During Roy's tenure, Sunshine Express Early Care and Education Center, that cares for children who are mentally and/or developmentally challenged, terminated its relationship with Bayouland.  As a direct result of Roy's conduct, 15-20 children withdrew from participation in a special program at Bayouland.

Participants in other programs lodged numerous complaints directly related to Roy's job performance.[7] Bayouland received recurring complaints about her handling of its soccer program, including a pattern of unacceptable interaction with participants' parents.  Parents described her as argumentative, inflexible and difficult to deal with. As a result of these complaints, Smith and Murdock Gilmore, another senior manager at the YMCA, scheduled a meeting with soccer parents to discuss their concerns on October 8, 2003.  Despite telling Mr. Gilmore on October 8 that she would attend the meeting, Roy did not show up.  Parents attending the meeting were further upset by this demonstration of Roy's apparent lack of interest in their concerns, but they characterized it as typical of her behavior toward them.

---

[7] A complaint by flag football participant Kevin Ramirez apparently forms the basis of Roy's gender discrimination claim.

Smith and Gilmore prepared a survey for parents to help Bayouland improve the soccer program. They distributed this survey at the October 8 meeting. Parents' responses to the survey demonstrated a high level of frustration and dissatisfaction with Ms. Roy's job performance. Through the survey, fully half of the parents responding described their perception of the program as "poor" and none of them rated it as "excellent." Only one of twelve parents who responded to the survey thought that their child would rate the program as excellent. Parents' comments described the program as disorganized and the director (Ms. Roy) as an extremely poor communicator who was not available to help resolve problems.

Although she was responsible for Children's Holiday Camp during Thanksgiving week, 2003, Roy left work early on Monday, November 24, without communicating with Smith. She remained absent on Tuesday. Due to her absence, there was inadequate staff to care for the children. Smith and his staff took steps to ensure that the children were properly supervised and to clear up significant confusion among parents regarding arrangements for their children's snacks. They also straightened out the activity schedule that Roy had prepared for the week, which was in disarray.

When Roy returned to work on Wednesday, November 26, she expressed displeasure with another manager who had stepped in to help during her absence and accused them of meddling with the operation of her department. She directed the same outrageous behavior toward Smith. Roy denied responsibility for the situation and denied that she had left the children in unsafe circumstances. Ms. Smith viewed her behavior toward him and other staff as insubordinate and completely unacceptable.

Smith considered this situation and Roy's response to it, together with her mounting record of poor performance and client dissatisfaction. Accordingly, he terminated her.

13

## B.   STANDARDS FOR ASSESSING A GENDER DISCRIMINATION CLAIM AT SUMMARY JUDGMENT

Plaintiff's claim of gender discrimination is guided by the shifting burdens framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973).  Initially, Plaintiff must establish a *prima facie* case of gender discrimination. She can do this by proving each of the following four elements:  (1) she belongs to a protected group; (2) she was qualified for her position; (3) she was dismissed or suffered an adverse employment action; and (4) the YMCA replaced her with a similarly qualified employee who was male, or treated similarly-situated males employees more favorably than it treated her. *Ward v. Bechtel Corp.*, 102 F.3d 199, 201 (5th Cir. 1997); *Smith v. Wal-Mart Stores, Inc.*, 891 F.2d 1177, 1179 (5th Cir. 1990); *Moody v. Weatherford U.S.*, 35,882 (La. App. 2d Cir. 7/17/02), 821 So.2d 780.

Once a plaintiff meets the initial burden, the employer must rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action. *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 654 (5th Cir. 1996).  If the employer presents such evidence, then the burden of proof shifts back to Plaintiff to present competent summary judgment proof that the employer's stated reason was merely a pretext for discrimination or that Rosemount's reason, while true, is only one of the reasons for the decision, and another 'motivating factor' is [Plaintiff's gender]." *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305 (5th Cir. 2004) *citing Desert Palace, Inc. v. Costa*, 123 U.S. 2148 (2003).

### C.   PLAINTIFF HAS NO EVIDENCE TO ESTABLISH EITHER PRETEXT OR THAT HER GENDER PLAYED A ROLE IN MR. SMITH'S DECISION

Plaintiff here establishes a prima facie case because of the happenstance the individual hired to replace her was male.[8] Beyond that, she has no evidence she was treated differently from any similarly situated male employee or any other evidence suggesting her gender played a role in her termination.

### 1.   Plaintiff Has No Evidence Of Similarly Situated Employees Being Treated Better Than Her

In her deposition, Plaintiff compared her treatment to that of two male directors, Mark Rogers, former director of fitness, and Scott Kramer, former director of aquatics. The following is her recitation of her comparison to Mr. Rogers.

> A.   There was a fitness director named Mark Rogers who was allowed to basically not show up for work, not perform duties, um, for a period of time, and I -- I on the other hand continued to strive to do my job, and do a good job, and was treated horribly, and this person was allowed just to continue not showing up for work, not performing duties.  Some of the duties that he had to perform would have been directly reported to the CFO, so whereas when we had deadlines and they had to be done, his was not done, therefore holding up the entire team.  So when Mr. Smith would receive  knowledge that this task was not done, he would become enraged and scream and yell at us why.  And,  you know, we all had to suffer for someone else, and this was allowed to continue.

> ****

> Q.   Do you know if Mr. Rogers -- do you have  any personal knowledge of whether Mr. Rogers was ever disciplined by Mr. Smith?

> A.   Yes.

> Q.   Tell me what you know.

> A.   I know he was discharged.

---

[8] Smith hired Pat Patterson to replace Roy. Mr. Patterson was a 15 year veteran of the Terrebonne Parks and Recreation Department including serving as its director for a four year period.

Obviously, as he was also discharged, Mr. Rogers was not treated any better than Plaintiff. "To establish disparate treatment, [a plaintiff] must show that [the employer] gave preferential treatment to another employee under 'nearly identical' circumstances." *Bryant v. Compass Group USA*, -- F.3d --, No. 04-40569 (5th Cir. June 16, 2005), *citing Okoye v. Univ. of Tex Houston Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001)(emphasis added). In fact, Mr. Smith hired a female, Kelly Guillot, to replace Mr. Rogers. Far from evidence of pretext, the comparison to Mr. Rogers is strong evidence Mr. Smith was not taking gender into account in his termination decisions.

Plaintiff also tries to compare her treatment to that of the director of aquatics, Scott Kramer. But her testimony reveals her claim of different treatment is in actuality nothing more than her own subjective opinion that she was a better employee than Mr. Kramer. Plaintiff contends she put in more hours than Mr. Kramer and that he failed to complete paperwork in a timely fashion.[9] However, she has no evidence Mr. Kramer engaged in similar conduct to her, *i.e.*, failing to provide adequate supervision for children in the Y's programs, angering parents, chasing away customers and acting insubordinately. She also admitted she had no knowledge of whether or how Mr. Smith was counseling Mr. Kramer.[10]

"It is not discrimination to treat differently situated persons differently." *Walton v. Bisco Industries, Inc.*, 119 F.3d 368, 373 (5th Cir. 1997). Thus, a plaintiff's proof of discrimination must consist of evidence of different treatment of individuals similarly situated in all respects. *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992).  Similarly situated individuals are those who are employed 1) in the same position, 2) under the same supervisor, 3) at the same time and who 4) engaged in the same conduct as the Plaintiff. *Id. See also Bryant v. Compass*

---

[9] Plaintiff's deposition pp. 27 – 28.

16

*Group USA*, -- F.3d --, No. 04-40569 (5th Cir. June 16, 2005)("the alleged theft of alcohol, party decorations, and table decorations is not the same as stealing money from a client's gift table at a catered event."); *Furr v. Seagate Technology*, 82 F.3d 980, 986 (10th Cir. 1996); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995). Mr. Kramer's alleged shortcomings, based solely on Plaintiff's own assessment of his performance, are not remotely similar to Plaintiff's and therefore are not indicative of pretext at all.

     2.     Plaintiff's "Other Evidence" Does Not Prove Gender Played A Role in Her Termination

Plaintiff testified about two other incidents she claims are evidence of gender discrimination. In the first, she claims she observed Mr. Smith yelling at another female employee.[11]

> A.    Uh, on one occasion I was in the hallway stapling up some program pictures on one of the bulletin boards, and I heard some screaming coming from the front lobby. As a manager at The Y, I became concerned and walked into the front lobby to observe what was going on and see if I could offer help to calm the situation so that our guest were not made to feel uncomfortable. When I entered the lobby, I observed Mr. Smith yelling, red in the face, at one of the female front desk workers in front of guests.
>
> Q.   How is that related to your gender?
>
> A.    She was a female. I'm a female. I believe that Mr. Smith treats females differently than he does males.

This testimony is a classic example of a plaintiff's own subjective belief that discrimination occurred and is not evidence of discrimination. an employee's subjective belief that she was discriminated against proves nothing. *Vance v. Union Planters Corp.*, 209 F.3d 438, 444 (5th Cir. 2000); *Nichols v. Lewis Grocer*, 138 F.3d 563, 571 (5th Cir. 1998)(when the only evidence plaintiff offers is her own "self-serving testimony" that discrimination influenced an employment

---

[10] Mr. Kramer was terminated after Plaintiff was terminated.

NewOrleans 253955.1

decision, her "subjective belief" is insufficient to create a jury question); *Little v. Republic Refining Co.*, 924 F.2d 93, 96 (5th Cir. 1991) (plaintiff's subjective belief that discrimination motivated employer's action is of little value and cannot be basis of judicial relief).

Plaintiff also points to a member's criticism of her handling of the flag football program and request for a "strong male director" as evidence of discrimination. Kevin Ramirez complained, among other things, about Roy's disorganization and lack of interest in responding to problems. He gave the YMCA a detailed list of observations, complaints and suggestions. One of his suggestions included, in his words, hiring a "strong **male** director for the league." Smith considered Ramirez's substantive complaints, but he certainly did not terminate Roy because of her gender or Ramirez's suggestion.

Plaintiff herself admitted she had no knowledge that this comment was ever relied upon by Mr. Smith.

> Q.    Ms. Roy, there was a comment that you've alluded to in your complaint that a program participant had filed a complaint with the board or with Mr. Smith or with somebody about the operation of I believe it was the flag football program.
>
> A.    Yes.
>
> Q.    And in that document he suggested there be a strong male director for the program, correct?
>
> A.    Yes.
>
> Q.    Now that person was not an employee of the YMCA, right?
>
> A.    No.
>
> Q.    And he was a program participant?
>
> A.    Yes.
>
> Q.    Okay.  And he was obviously unhappy with how the leagues had been run, correct?

---

[11] Mr. Smith denies yelling at the employee, but it will be assumed that he did for purposes of this motion only.

A.   For multiple years.

Q.    Do you have any personal knowledge of  how the board considered his comments?

A.   No.

Q.    Do you have any personal knowledge of how Mr. Smith considered his comment?

A.   No.

Q.    Okay.  Do you have any personal knowledge of whether they gave any weight to his comment at all?

A.   No.

To be probative an employer's discriminatory intent, a comment "must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that [race] was an impermissible factor" in the adverse decision. *EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996), *citing, Bodenheimer v. PPG Industries Inc.*, 5 F.3d 955, 958 (5th Cir.1993). In determining whether a comment should be classified as a "stray remark," the Court considers several factors, including "whether the comment is specific or vague." *Guthrie v. Tifco Industries*, 941 F.2d 374, 379 (5th  Cir. 1991). To be probative, "allegedly discriminatory comments must be made by the relevant decision maker." *Nichols v. Loral Vought Systems Corp.*, 81 F.3d 38, 41-42 (5th Cir. 1996)(rejecting comments by supervisor regarding plaintiff's age because supervisor "was not the relevant decision maker.") *See also Travis v. Board of Regents of the University of Texas System* , 122 F.3d 259, 264 (5th Cir. 1997)(isolated comment by a person with no connection to employee's application for promotions "has no evidentiary force"); *EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996)(comment "not probative" of whether employer's decision to terminate employee was motivated by age discrimination because person who made comment "was not a

19

decisionmaker" regarding the termination); *Guthrie v. Tifco Industries, Inc.*, 941 F.2d 374, 378-79 (5th Cir. 1991)(comments by retired supervisor when he no longer made personnel decisions was insufficient evidence of age-bias).

Here, the comment Plaintiff alludes to was not made by a decision maker and there is no evidence the comment influenced the decision to terminate Plaintiff's employment in any way. It is not evidence gender played a role in Plaintiff's termination.

> 3. The Same Actor Inference Slams The Door On Plaintiff's Claim of Gender Discrimination

The biggest hurdle Plaintiff must overcome in attempting to prove that Mr. Smith discriminated against her on account of her gender is the fact he put her in her position in the first place.

> Q. What was your first position at The Y?
>
> A.   Kid zone attendant.
>
> Q.   Who promoted you to program director?
>
> A.   Mr. Smith.

The same actor rule "gives rise to an inference that discrimination was not the motive" behind the demotion. *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996).  The theory behind this presumption is that a decision-maker would not hire from a group he dislikes and incur the psychological costs of associating with them only to demote or fire them once they are on the job.  *Id. See also, Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 320 n.3 (5th Cir. 1997); *Nieto v. L&H Packing Co.*, 108 F.3d 621, 624 (5th Cir. 1997). Here, it is absurd to suggest Mr. Smith was prejudiced toward Plaintiff because of her gender when he decided to fire her after he hired her for her position in the first instance.

20

4.    Plaintiff's Testimony Reveals Even She Does Not Truly Believe Her Gender Played A Part In Her Termination

When asked the simple question, "Why do you think you were terminated," the first response Plaintiff gave had nothing to do with her gender. Instead she opined Mr. Smith did not like her because she was vocal in her opposition to his practices. She claims she complained about the way he treated the staff, about alcohol being served at functions Bayouland hosted for different groups and about not allowing the managers to attend YMCA America trainings.[12] None of these is remotely connected to gender discrimination.

## IV.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### A.    THE STANDARDS FOR ASSESSING AN INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM

To recover for intentional infliction of emotional distress, a plaintiff must prove:  1) the defendant's conduct was extreme and outrageous, 2) the conduct caused severe emotional distress to the plaintiff, and 3) the defendant intended to cause the severe emotional distress or was substantially certain it would result from the conduct.[13]  If a plaintiff fails to establish any one of these elements, she cannot assert a claim for intentional infliction of emotional distress. As to what constitutes "extreme and outrageous" conduct, the Louisiana Supreme Court stated:

> The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.  Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Persons must necessarily be expected to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.[14]

---

[12] Plaintiff's Deposition pp. 74 – 75.
[13] *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991).
[14] *Id.*

21

The distress suffered must be such that "no reasonable person could be expected to endure it."[15] Thus, disciplinary action and conflict in a pressure-packed workplace environment, although calculated to cause some degree of mental anguish, is not ordinarily actionable.[16] Liability will not arise where the conduct is intended merely to cause fright, humiliation or embarrassment.[17]

### B.   PLAINTIFF CANNOT PROVE A SINGLE ELEMENT OF AN INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM

Here Plaintiff cannot prove even one element of an intentional infliction claim. What she is complaining about is merely the ordinary stress of the workplace. She testified:

> A.   There were occasions when Mr. Smith in meetings would single out my actions or my job performance that would have caused me emotional distress.
>
> ****
>
> A.   Perhaps the program department had not met its number in attendance in programming or had the expense exceeded the income for the week, and, um, Mr. Smith dwelled and focused on that shortcoming, uh, in general on myself without saying, you know, you did a good job, or without providing advice on how to fix the problems, or allow me to attend trainings to learn how to do it correctly or getting any sort of guidance.  And at those times I would feel distressed and wonder how to continue and improve without direction and guidance -- positive direction and guidance. On two occasions Mr. Smith -- on one occasion he called me into his office and on the second occasion he came into my office and requested that I modify attendance numbers in a particular program so that we could show we had more children attending under a certain status to gain additional resources through a financial grant.[18]

---

[15] *Id.* at 210.

[16] *Id.*

[17] *Id. See also Deus v. Allstate Ins. Co.*, 15 F.3d 506, 514 (5th Cir.), *cert. denied,* 513 U.S. 1014, 115 S.Ct. 573 (1994) ("the rough-and-tumble of daily business life contemplates a degree of teasing and taunting that in other circumstances might be considered cruel and outrageous"); *Smith v. Ouachita Parish School Board,* 702 So.2d 727, 736 (La.App.2 Cir. 1997).

[18] Mr. Smith denies asking Plaintiff to lie about participant numbers. He told her he wanted her to increase participants in the programs. This dispute is not material for purposes of this motion.

This is not the stuff of an intentional infliction claim. *See Labove v. Raftery*, 2000 La. App. LEXIS 876, at *24 (La. Ct. App. Apr. 19, 2000) ("[D]isciplinary action and conflict in a pressure-packed workplace environment, although calculated to cause some degree of mental anguish, is not ordinarily actionable. Recognition of a cause of action for intentional infliction of emotional distress in a workplace environment has usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time.").

Second, Plaintiff's own testimony belies any allegation she suffered extreme emotional distress. She sought no medical treatment as a result of the alleged actions of Defendants.[19]Finally, Plaintiff has no evidence that anyone intended to inflict severe emotional distress on her. *See Webb v. Theriot*, 704 So. 2d 1211, 1214 (La. Ct. App. 3rd Cir. 1997)(affirming trial court's dismissal of claim in finding that "there was no evidence to show that the distress was severe and there was no evidence to prove that the defendant intended to inflict severe emotional distress"). Accordingly, plaintiff's claim must be dismissed. The claim simply fails.

## V.   CLAIMS AGAINST MR. SMITH INDIVIDUALLY

To the extent the court does not dismiss all claims on the merits, it must dismiss all the claims against Mr. Smith. First, Plaintiff has never served Mr. Smith with the Petition, either in state court or following removal. Second, there simply is no individual liability under either Title VII or Louisiana state employment laws for the type of claims Plaintiff is alleging. *See, e.g., Barrios v. Kody Marine*, 2000 WL 422392 (E.D. La.), citing *Grant v. Lone Star Co.*, 21 F.3d 649, 653 (5th Cir.1994) (Title VII) and *Devillier v. Fidelity & Deposit Co. of Maryland*, 709 So.2d 277, 280-81 (La.Ct.App.3d Cir.1998) (La. R.S. 23:332).

---

[19] Q.   Okay.  Have you sought any counseling or other medical treatment related to the conditions of employment you are alleging at the Y? A.   No. Plaintiff's Deposition p. 110.

23

## VI.    **CONCLUSION**

Plaintiff obviously thinks she was a superstar employee who did not deserve to be fired. Mr. Smith and many of Bayouland's constituencies did not agree with her assessment of her performance. But there is no evidence her gender played a role in Mr. Smith's decision to terminate her. Her sexual harassment claims and intentional infliction claims fall woefully short of the line where conduct becomes actionable.

Wherefore, Defendants pray their motion be granted and all Plaintiff's claims against them be dismissed with prejudice at Plaintiff's sole cost and expense.

Submitted this ____ day of June 2005.

**EDWARD F. HAROLD**
   Louisiana Bar Roll No. 21672
**KEVIN TROUTMAN**
   Louisiana Bar Roll No. 27668
Fisher & Phillips LLP
201 St. Charles Ave., Suite 3710
New Orleans, Louisiana 70170
Telephone:  (504) 522-3303
Facsimile:  (504) 529-3850
Email:       eharold@laborlawyers.com

**COUNSEL FOR DEFENDANTS,
BAYOULAND YMCA AND ALEX SMITH**

24

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Memorandum in Support of

Motion to Dismiss and Motion for Summary Judgment has been served via hand delivery on:

Bethany Roy
5425 Bayou Black Dr.
Gibson, LA 70356

on this **21** day of June 2005.

EDWARD F. HAROLD

NewOrleans 253955.1

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| BETHANY ROY, | CIVIL ACTION NO. 04-3011 |
| Plaintiff, | SECTION C |
| VERSUS | JUDGE HELEN G. BERRIGAN |
| BAYOULAND YMCA and ALEX SMITH, | MAGISTRATE NO. 4 |
| | MAGISTRATE KAREN WELLS ROBY |
| Defendants. | |

<u>**EXHIBITS SUPPORTING MOTION FOR SUMMARY JUDGMENT**</u>

A.  Deposition of Bethany Roy inclusive of Exhibits thereto.

B.  Declaration of Alex Smith inclusive of Exhibits thereto.

C.  Declaration of Rene Williams.

Respectfully submitted,

**EDWARD F. HAROLD**
   La. Bar Roll No. 21672
**KEVIN TROUTMAN**
      Louisiana Bar Roll No. 27668
Fisher & Phillips LLP
201 St. Charles Avenue
Suite 3710
New Orleans, Louisiana  70170-3710
Telephone:  (504) 522-3303
Facsimile:  (504) 529-3850

**COUNSEL FOR DEFENDANTS,
BAYOULAND YMCA AND ALEX
SMITH**

## CERTIFICATE OF SERVICE

I hereby certify that I have served the above and foregoing via Hand Delivery properly addressed and postage prepaid on:

Bethany Roy
5425 Bayou Black Drive
Gibson, LA 70356

this **24** day of June 2005.

EDWARD F. HAROLD

2

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

BETHANY ROY,                                CIVIL ACTION NO. 04-3011

            Plaintiff,             SECTION C

VERSUS                                      JUDGE HELEN G. BERRIGAN

BAYOULAND YMCA and                          MAGISTRATE NO. 4
ALEX SMITH,
                                            MAGISTRATE KAREN WELLS ROBY
            Defendants.

### NOTICE OF HEARING

Please take notice that Defendants Bayouland YMCA and Alex Smith will bring on for

hearing their Motion to Dismiss and/or Motion for Summary Judgment before the Honorable

Helen Ginger Berrigan on July 6, 2005 at 9:30 a.m. or as soon thereafter as counsel may be heard

at Room C552, United States Courthouse, 500 Poydras St., New Orleans, Louisiana 71030.

Respectfully submitted,

**EDWARD F. HAROLD**
  La. Bar Roll No. 21672
**KEVIN TROUTMAN**
    Louisiana Bar Roll No. 27668
Fisher & Phillips LLP
201 St. Charles Avenue
Suite 3710
New Orleans, Louisiana  70170-3710
Telephone:  (504) 522-3303
Facsimile:  (504) 529-3850

**COUNSEL FOR DEFENDANTS,**
**BAYOULAND YMCA AND ALEX**
**SMITH**

## CERTIFICATE OF SERVICE

I hereby certify that I have served the above and foregoing Notice of Hearing via hand delivery on:

Bethany Roy
5425 Bayou Black Drive
Gibson, LA 70356

this 21 day of June 2005.

EDWARD F. HAROLD

NewOrleans 254882.1

# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED